# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

MANGEMENT REGISTRY, INC.,

      Plaintiff/Counterclaim Defendant,

v.

A.W. COMPANIES, INC.; ALLAN K.
BROWN; WENDY BROWN; and
MILAN BATINICH;

      Defendants/Counterclaim Plaintiffs.

Case No. 0:17-cv-05009-JRT-KMM

**REPORT AND
RECOMMENDATION**

This matter is before the Court on two dispositive motions filed by the defendants, A.W. Companies, Inc. ("AW"), Allan K. Brown, Wendy Brown, and Milan Batinich.[1] They ask the Court to strike the Management Registry, Inc.'s ("MRI"), request for punitive damages from the Second Amended Complaint ("SAC") filed on July 12, 2019. (Defs.' Mot. to Strike, ECF No. 256; Defs.' Mem. in Supp. of Mot. to Strike ("Strike Mem."), ECF No. 257; SAC, ECF No. 251.) Further, the defendants ask the Court to dismiss each of the thirteen counts from the SAC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).[2] (Defs.' Mem. in Supp. of Mot. to Dismiss ("MTD Mem."), ECF No. 266.) The Court generally agrees that the SAC contains too

---

[1]    On July 26, 2019 the District Court referred these dispositive motions to the undersigned for a report and recommendation. (ECF No. 259.) In this R&R, the Court refers to the defendants collectively as "defendants," to Allan Brown individually as "Mr. Brown," and to Wendy Brown individually as "Ms. Brown."

[2]    As discussed below, the defendants argue that one claim should be dismissed for improper venue under Rule 12(b)(3).

many claims for effective determination by a jury at trial. But that impression does not support dismissing otherwise properly pled counts at this stage. For the reasons that follow,[3] the Court recommends that the defendants' motion be denied.

## I.    Motion to Dismiss

The defendants' motion to dismiss asserts that every count in the SAC should be dismissed for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). The standard for analyzing a motion to dismiss under this Rule is familiar. To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 500 U.S. 544, 570 (2007). This standard does not require the inclusion of "detailed factual allegations" in a pleading, but the complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

In applying this standard, the Court must assume the facts in the complaint to be true and must construe all reasonable inferences in the light most favorable to the plaintiff. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). But the Court need not accept as true any wholly conclusory allegations, *Hanten v. School District of Riverview*

---

[3]    As the factual allegations in this litigation are familiar to the parties, the undersigned, and the District Court, the R&R will not include a lengthy recitation of the factual background. Instead, the Court will discuss only the relevant facts in the context of analyzing each issue raised by the defendants' motion to dismiss.

*Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions that the plaintiff draws from the facts pled, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

### A. "Shotgun Style" Pleading

The defendants complain that several counts in the SAC are alleged "shotgun style," meaning that the allegations are asserted against the "defendants" collectively, but do not identify the individual actor whose conduct is alleged to have given rise to the claim. (*See, e.g.,* MTD Mem. at 14–15 (arguing that the tortious interference claim fails "because it is pled shotgun style against every defendant" and citing SAC ¶¶ 130–31).) The problem with this argument is that it focuses on the paragraphs setting forth the various "counts" in the SAC, but ignores detail provided through the factual allegations in the fifty-four page pleading. The Court is required to read the SAC as a whole to determine whether claims are plausibly alleged. Through this appropriate lens, the SAC adequately articulates the conduct of each defendant that, if true, would support each claim. Therefore, the Court rejects this argument.

### B. Common Law Fraud Claim (Count II)

The defendants argue that the common-law fraud claim in Count II of the SAC should be dismissed. For several reasons, the Court concludes that none of the challenges to Count II carries the day and dismissal is not required.

To state a claim for common law fraud under Minnesota law, a complaint must plausibly allege facts establishing the following elements:

> (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to

induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance.

*U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011). In addition, the Federal Rules of Civil Procedure require a party alleging fraud to "state with particularity the circumstances constituting fraud...." Fed. R. Civ. P. 9(b). "Rule 9(b) requires plaintiffs to plead the who, what, when, and how: the first paragraph of any newspaper story." *Zayed v. Associated Bank, N.A.*, 779 F.3d 727, 733 (8th Cir. 2015) (internal quotations omitted). Even applying the heightened standards of Rule 9(b) to Count II, the Court concludes that the defendants' motion to dismiss is unpersuasive.

### Specificity

The defendants first argue that MRI failed to plead Count II with the specificity required by Fed. R. Civ. P. 9(b). (Dismissal Mem. at 5–9.) The Court finds otherwise. The SAC identifies the alleged false statements with adequate precision. For example, MRI alleges that Mr. Brown and Ms. Brown "falsely told Mr. Berg that Ms. Brown had already purchased ARI, and that Mr. Berg would be part owner of the acquired business." (SAC ¶ 61.) This false statement allegedly induced Mr. Berg, while he was still employed by MRI, to cancel MRI's contracts, solicit its customers for business with Ms. Brown's new company, and convince MRI employees that they in fact worked for Ms. Brown. (*Id.*; *see also id.* ¶¶ 101–05.) Ms. Brown allegedly misrepresented that she had purchased the Jeane Thorne business in a statement to Brenda McNamara, an MRI employee, which then allegedly induced Ms. McNamara to copy files from her computer (including MRI contracts and other business documents) to her personal e-mail account for use at AW.

(SAC ¶ 67; *id.* ¶¶ 106–09.) Mr. Brown allegedly misrepresented that he was not receiving a commission as part of MRI's acquisition of Mr. Brown's businesses, and MRI allegedly relied on that statement when it decided to offer him employment following the acquisition. (SAC ¶¶ 98–100.) The Court finds these allegations are sufficiently particular to satisfy Rule 9(b) and, if true, support an inference that Mr. Brown and Ms. Brown made intentional misrepresentations with the purpose of inducing MRI's reliance.

### Reliance

The defendants argue that the common-law fraud claim must be dismissed because MRI does not plead facts supporting justifiable reliance. (MTD Mem. at 5–9.) The Court is not persuaded by this argument either. Taking the allegations in the SAC as true, Mr. Brown's false statement that he was not receiving a commission as a result of the acquisition of the AllStaff business induced MRI to offer him employment following the acquisition. As articulated in the SAC, Mr. Brown "marketed the Acquired Businesses in such a manner as to suggest that MRI could rely upon his judgment and assessment, since he was not receiving a commission or other similar compensation as a result of his services," eventually "leading MRI to desire Mr. Brown to continue serving as President of the Division that encompassed the vast majority of the Acquired Businesses…." (SAC ¶¶ 24–25.) Berg and McNamara, acting as MRI employees, allegedly relied on Ms. Brown's false statements about her ownership of the ARI and Jeane Thorne Staffing business divisions to MRI's detriment. The SAC adequately alleges that, had Ms. Brown told the truth about the fact that she was not the rightful owner of those divisions of the

5

MRI business, MRI's employees would not have taken the actions that MRI claims damaged its business.

Relatedly, the Court is not persuaded that the circumstances of this case require a conclusion that MRI's fraudulent-inducement claim against Mr. Brown should be dismissed because reliance was unjustified as a matter of law. The defendants rely on *Boyd v. DeGardner Realty & Constr.*, 390 N.W.2d 902 (Minn. Ct. app. 1986), to argue that MRI could not justifiably rely on any promises that directly contradict written agreements. (*See* MTD Mem. at 7–8.) In *Boyd*, the Minnesota Court of Appeals noted case law holding that "where an oral representation completely contradicts a written contract provision, reliance on the oral representation is unjustifiable as a matter of law." 390 N.W.2d at 904. Similarly, in *Crowell v. Campbell's Soup Co.*, 264 F.3d 756 (8th Cir. 2001), the Eighth Circuit held that chicken growers could not justifiably rely on a processor's alleged oral promise to only terminate contracts for cause when the agreements provided the processor a unilateral termination right and contained a complete integration clause. *Id.* at 759–60, 762–63 ("We agree with the district court that any reliance by the Growers on the three alleged oral promises made by [the processor] was unreasonable as a matter of law because each of the alleged oral promises plainly contradicted the terms of the written contract.").

However, it is equally true under Minnesota law that "[w]hen a promise is not in plain contradiction of a contract, or if contradictory, when it is accompanied by misrepresentations of other material facts in addition to the contradictory intent, the question of reliance is for the trier of fact." *Crowell*, 264 F.3d at 762 (citing *Commercial*

*Prop. Invs., Inc. v. Quality Inns Int'l, Inc.*, 938 F.2d 870, 876 (8th Cir. 1991)). The *Commercial Prop. Invs.* court found that a plaintiff's fraud claim could proceed even though the parties' contract contained an integration clause because the defendant made repeated statements about the viability of a hotel franchise to the plaintiff that were not in plain contradiction to the contract. *Id.* at 875–76.

Here, the defendants fail to identify any provision of the Stock Purchase Agreement that directly contradicts Mr. Brown's alleged false statement that he would not be receiving a commission as a result of the Stock Purchase Agreement, making this case readily distinguishable from *Boyd*. Indeed, the SAC alleges that "Mr. Brown illicitly received sales commissions from the sale to MRI even though the sellers confirmed, in each of the Agreements, that no such commissions were paid, and even though each of the Agreements specifically precluded any such commissions." (SAC ¶ 15.) The defendants' argument that the reliance alleged in Count II fails as a matter of law does not carry the day.

### False Statements to MRI Employees

The defendants argue that Ms. Brown's alleged misrepresentations to Berg and McNamara are not actionable as a matter of law because Berg and McNamara are employees of MRI and no false statements were made to MRI itself. In support of this argument, the defendants rely on *Schaaf v. Residential Funding Corp.*, No. 05-cv-1319 (JNE/SRN), 2006 WL 2506974 (D. Minn. Aug. 29, 2006) (Order adopting R&R), and *Vikse v. Flaby*, 316 N.W.2d 276, 284 (Minn. 1982). These cases do not support dismissal under Rule 12(b)(6).

In both *Vikse* and *Schaaf*, the relevant issue was whether a claim for fraud can be based on a defendant's alleged misrepresentation to a third party. *Vikse*, 316 N.W.2d at 284 (concluding that a fraud claim was actionable where an independent contractor provided the plaintiff with false information about a company's finances that the contractor received from the defendants where the defendants "knew and intended that [the contractor] would be passing on [the false] information to potential investors"); *Schaaf*, 2006 WL 2506974, at *17 (concluding that the plaintiffs failed to state a fraud claim because the defendant's misrepresentations were not alleged to have reached the individual investor plaintiffs until after they made investment decisions and received the written prospectus containing the false statements). Both involved a question of whether the allegedly fraudulent statement reached the plaintiff, but neither stands for the proposition that misrepresentations made to the plaintiff's own employees do not reach the corporate plaintiff itself. Here, the plaintiffs' fraud theory is that Ms. Brown lied to Berg and McNamara about the status of her ownership of two divisions of MRI's business; Berg and McNamara were MRI employees at the time; and Berg and McNamara, as agents of MRI, relied on Ms. Brown's allegedly false statements when they took actions that were detrimental to MRI's business interests. In light of this reality, *Vikse* and *Schaaf* do not require dismissal of the fraud claims.

Ultimately, the Court cannot conclude that MRI fails to state any actionable fraud claim based on the alleged flaws identified in the defendants' motion to dismiss.

### C.  Deceptive Trade Practice Act Claim (Count V)

The defendants next assert that the Court should dismiss the claims under the Minnesota Deceptive Trade Practice Act ("MDTPA"), Minn. Stat. § 325D.44, in Count V of the SAC. Specifically, the defendants argue that the MDTPA claim fails because MRI has not alleged there is any likelihood of future harm. (MTD Mem. at 10–11.) The defendants also argue that the SAC does not describe with particularity what products or services of MRI the defendants allegedly passed off as their own. (*Id.* at 11.)

#### *Likelihood of Future Harm*

Under the MDTPA, "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable." Minn. Stat. § 325D.45, subd. 1. A plaintiff alleging an MDTPA claim must show a likelihood of future harm because the statute provides relief only "from future damage, not past damage." *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003).

The Court concludes that MRI adequately alleges a likelihood of future harm. The SAC alleges that the defendants engaged in deceptive practices by: (1) falsely stating that Ms. Brown owned the All-Calls and Jeane Thorne divisions of MRI's business; (2) telling MRI customers that they were released from their contracts with MRI's affiliates and subsidiaries; (3) changing the name on the billing for MRI's clients to reflect that the bills were coming from AW; (4) changing the names on contracts from MRI's legitimate company to AW without MRI's knowledge; and (5) palming off MRI's products and services under AW's name and illegally receiving compensation for those

services. (SAC ¶ 123(a)–(e).) In Paragraph 125 of the SAC, MRI alleges that "there is no complete adequate remedy at law" for this conduct and that it is "continuing in nature, and will continue unless properly enjoined." (*Id.* ¶ 125.) Standing alone, the allegation in Paragraph 125 of the SAC might be too conclusory a statement, as the defendants contend,[4] to meet the pleading standards governing Rule 8 and motions to dismiss under Rule 12(b)(6). But this allegation does not stand alone. Read in conjunction with the allegations that AW essentially sniped MRI's own customers through the use of deceptive and misleading statements about the source of the services being provided, the SAC provides a sufficient basis to support a claim of future harm.

### "*Palming Off*"

The defendants next assert that the SAC "does not detail what products or services were 'palmed off.' The reality is that MRI never did business in Minnesota so there could be no confusion. Further, the only parties with standing would be those confused—not MRI. This claim just doesn't belong here and should be dismissed." (MTD Mem. at 11.)

As in other locations in their memorandum, the defendants essentially ask the Court to do their work for them. They provide no citation to case law to support the argument that MRI lacks standing to complain about the defendants' alleged deceptive practices. Moreover, the defendants' assertion about "the reality … that MRI never did business in Minnesota" does not address the adequacy of plaintiff's allegations, but

---

[4]     Defs.' Reply at 3, ECF No. 289.

introduces a question of fact inappropriate in the Rule 12(b)(6) context. These arguments are not enough to support dismissal at this stage.

The Court declines to recommend that Count V of the SAC be dismissed.

### D. Tortious Interference Claim (Count VI)

The defendants argue that MRI has failed to adequately plead any of the elements of tortious interference with contract and tortious interference with prospective economic advantage in Count VI of the SAC. (MTD Mem. at 12–19.) As explained below, the Court disagrees with both assertions and finds that the allegations in Count VI are adequately pled.

A claim for tortious interference with contract requires the plaintiff to plead the following elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *St. Judge Medical, S.C., Inc. v. Biosense Webster, Inc.*, 994 F. Supp. 2d 1033, 1048 (D. Minn. 2014) (quoting *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998)).

A claim for tortious interference with prospective business advantage requires a showing of the following elements:

> (1) the defendant intentionally and improperly interfered with the prospective contractual relationship; (2) causing pecuniary harm from the loss of the relationship's benefits; and (3) the interference either (a) induced or caused a third person not to enter into or continue the prospective relationship or (b) prevented the continuance of the prospective relationship.

*Matson Logistics, LLC v. Smiens*, No. CIV. 12-400 ADM/JJK, 2012 WL 2005607, at *11

(D. Minn. June 5, 2012) (quoting *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633

(Minn.1982)).

### Tortious Interference by AW

Defendants argue that the SAC contains no facts that could support a claim for

tortious interference with contracts against AW. (MTD Mem. at 12–13.) Specifically,

they assert that the SAC fails to state a claim for tortious interference with Mr. Brown's

employment agreement because AW is not alleged to have existed until two or three days

after Mr. Brown resigned from MRI. (*Id.*) This argument echoes the District Court's

rationale for denying MRI's motion for preliminary injunction.[5] Of course, the District

Court's analysis was not based on the standard governing a Rule 12(b)(6) motion, and its

decision was issued more than a year before the SAC was filed. In the SAC, the plaintiff

alleges that, after its formation, AW "currently employs, or has employed," a number of

MRI's employees, including Mr. Brown, whose relationship to MRI was governed by

noncompete and nonsolicitation provisions. (SAC ¶ 74.) MRI's claim is that AW has

engaged in "on-going and continuing breaches" of those agreements. (Pl.'s Resp. at 9.)

MRI argues that it is immaterial that Mr. Brown resigned before AW was officially

incorporated because, after AW's formation, AW induced Mr. Brown to breach the still

---

[5]      Order (Jan. 16, 2018), ECF No. 98 at 11 (concluding that MRI failed to show a likelihood of
success on the merits on its tortious interference claim because "MRI did not articulate how A.W. –
which came into legal existence on October 30 – intentionally procured either of Mr. Brown's or
Mr. Berg's alleged breaches on or after October 30").

effective non-compete and non-solicitation provisions from his contract with MRI. (Pl.'s Resp. at 8–9.)

The Minnesota Supreme Court's decision in *Kallok v. Medtronic*, 573 N.W.2d 356 (Minn. 1998), supports the Court's conclusion that the SAC states a plausible claim that AW tortiously interfered with Mr. Brown's non-compete agreement. The *Kallok* court held that "if a noncompete agreement is deemed valid and if the elements of tortious interference are established, interference with the noncompete agreement by a third party is a tort for which damages are recoverable." *Id.* at 361. The SAC alleges that Mr. Brown and MRI had an enforceable noncompete agreement; that AW knew of Mr. Brown's noncompete agreement with MRI; that despite that knowledge, AW induced Mr. Brown to breach his noncompete agreement with MRI, using misrepresentations to establish relationships between MRI's customers and Mr. Brown; that AW lacked justification to induce Mr. Brown to form those relationships with MRI's customers because it was aware that his noncompete agreement prohibited them; and that this has harmed MRI's business. This is sufficient to state a claim for tortious interference with Mr. Brown's noncompete agreement with MRI against AW.[6]

### *Failure to Plead Absence of Justification*

The defendants also argue that MRI fails to plead an absence of justification as to the acts of any defendant, thereby failing to allege a critical element of the claims in

---

[6]   The defendants also argue that the SAC fails to state a tortious interference claim against AW relating to Mr. Berg's contract because Berg's alleged breaches occurred within the 48 hours immediately following AW's creation without any allegation that AW contacted Berg during that period. (MTD Mem. at 13.) However, the SAC sufficiently alleges that AW induced Mr. Berg to breach his noncompete and agreement with MRI. (SAC ¶¶ 61, 128–32.)

Count VI. (MTD Mem. at 16.) The Court notes that the burden of proving a defendant was justified in its actions of procuring a breach of contract is on the defendant and the issue ordinarily requires a factual determination of "what is reasonable conduct under the circumstances." *Kallok*, 573 N.W.2d at 362. The defendants point to no facts in the SAC that establish their alleged conduct was reasonable under the circumstances. Based on the Court's detailed review of the SAC's allegations, which are taken as true at this stage, MRI adequately shows that the defendants acted without justification in interfering with noncompete and nonsolicitation employee agreements and in interfering with MRI's contracts with its customers.

### *No Independently Tortious Conduct*

The defendants argue that the SAC does not allege any independently tortious or unlawful conduct that would support a claim for prospective economic advantage. (MTD Mem. at 17–18.) The Court disagrees. The SAC adequately alleges that AW, Ms. Brown, Mr. Brown, and Mr. Batinich all made a slew of intentional misrepresentations designed to steal business from MRI. That conduct forms the basis for several tort claims that are separate from the alleged interference with prospective economic advantage. For example, Ms. Brown, on behalf of AW, is alleged to have used misrepresentations to an MRI employee to gain access to MRI's confidential information (an alleged misappropriation of trade secrets), which was then further used to interfere with MRI's relationships to its customers. (SAC ¶¶ 67–68.) Mr. Brown, Mr. Batinich and AW allegedly engaged in similar independently tortious conduct, which was also tied to alleged interference with MRI's prospective business relationships. (SAC ¶¶ 53, 85–89.)

14

### Retaining Business

Finally, the defendants argue that Count VI should be dismissed because MRI failed to show that it would have retained the allegedly stolen business. They argue that MRI had no presence in Minnesota to service any clients, and after the Wendy Deal failed to materialize, "[i]f Wendy didn't keep going the Minnesota business would have cratered thus there is no possible expectation." (MTD Mem. at 19.) Again, the Court disagrees that this is a basis for dismissal. The SAC alleges that MRI had just paid a significant sum to purchase the acquired entities in September of 2017, and intended to grow the All-Calls business model throughout the country. (SAC ¶¶ 14, 19.) Some of the acquired businesses were Minnesota companies. (SAC ¶¶ 20–21.) These allegations support an inference that MRI had a basis to expect continued relationships with the Minnesota companies as a result of the September 2017 purchase agreements. Perhaps the defendants will be able to convince a finder of fact that Wendy's ongoing involvement was the only way that the Minnesota businesses could have continued to operate, but that is not an appropriate consideration for a motion to dismiss.

### E.  Malicious Injury Claim (Count III)

The defendants seek dismissal of the "malicious injury" claim in Count III of the SAC. Under Minnesota law, a claim for "malicious wrong" was recognized as a distinct claim from defamation based on statements made by a defendant about a plaintiff's business. *Marudas v. Odegard*, 10 N.W.2d 233 (Minn. 1943). This claim requires allegations that "the defendant maliciously intended to injure the plaintiff by his words and succeeded in his malicious intent, and damage to the plaintiff was the direct result of

15

the defendant's words, ... whatever the nature of the words, provided they are untrue." *Id.*
at 235; *see also Keckhafer v. Prudential Ins. Co. of Am.*, No. CIV.01-1017 RHK/AJB,
2002 WL 31185866, at *5 (D. Minn. Oct. 1, 2002) ("Thus, where a plaintiff alleges that a
defendant maliciously intended to injure him or her by communicating false words and
has succeeded in that malicious intent, and damage to the plaintiff is the direct result of
the defendant's untrue words, a claim exists under Minnesota law upon which relief can
be granted.").

The defendants argue that the SAC includes no allegations showing that they had
the requisite intent to harm MRI. (MTD Mem. at 19–20.) The Court disagrees. The SAC
specifically asserts that each of the defendants took steps to intentionally harm MRI's
business by making false statements to MRI's employees and customers. This allegation
of intentional misconduct is, in fact, the gravamen of the entire pleading, and it is
reasonable to infer the defendants' intended to harm MRI from the allegations set forth in
the SAC. (SAC ¶¶ 113–15.)[7] The defendants' motion to dismiss Count III should be
denied.

### F. Defamation Claim (Count IV)

The defendants assert that the defamation claim in Count IV of the SAC should be
dismissed. "Defamation under Minnesota law requires proof that the alleged defamatory
statement (1) was communicated to someone other than the plaintiff, (2) was false, and

---

[7]     Again, the defendants complain that the allegation in Paragraph 113 of the SAC is too conclusory
(Defs.' Reply at 6), but that assertion is not the only one in the pleading that bears upon the issue of
malicious intent; the defendants ignore the broader context of the allegations.

(3) tended to harm the plaintiff's reputation and lower [the plaintiff] in the estimation of the community." *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1142 (8th Cir. 2014) (quoting *Chambers v. Travelers Cos.*, 668 F.3d 559, 564 (8th Cir. 2012)) (alteration in *Thomas*). A false statement that "affects the plaintiff in his business, trade profession, office or calling ... is defamation per se...." *Id.* (quoting *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 920 (Minn. 2009)). Statements of opinion are not actionable, but statements that "present or imply the existence of fact that can be proven true or false" are. *Id.* (quoting *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147 (8th Cir. 2012). Whether a statement is true or false is generally a jury question. *Id.* (citing *Keuchle v. Life's Companion P.C.A., Inc.*, 653 n.W.2d 214, 218 (Minn. Ct. App. 2002)).

### *More than Employee Confusion*

The Court disagrees that dismissal of the defamation claim is required under Rule 12(b)(6). The defendants argue that dismissal is required because the SAC contains no allegation of harm to MRI's reputation in the community, but claims only that some employees "were confused as a result of the failure of the Wendy Deal." (MTD Mem. at 21.)

The relevant allegations do more than merely indicate that some employees were confused as a result of the failure of the Wendy Deal. The SAC asserts that Mr. Batinich, at the direction of Mr. Brown and Ms. Brown, defamed MRI to its employees by falsely stating at an October 30, 2017 emergency team meeting: (1) that they needed to agree to be a part of an AW affiliate (Experience Call Center Recruiting) or they would lose their

commissions; and (2) that MRI could not perform the services provided by AW and its affiliate. (SAC ¶ 62.) These same statements allegedly indicated that MRI "did not have any business." (SAC ¶ 117.) MRI alleges that on October 31, and November 1, 2017, the defendants directed Mr. Berg to make false statements to MRI's customers "that MRI had no ability to perform the services being rendered by A.W. as the purported successor in interest to ARI[.]" (*Id.* ¶ 118.)

It is reasonable to infer that alleged lies to MRI's customers harmed MRI's reputation in the relevant business community. The allegedly false statements imply that MRI was offering to do work for its customers that it could no longer perform because AW had taken over the acquired businesses.[8] The claimed statements are allegedly false because, according to the SAC, AW had not, in fact, succeeded in interest to any of the acquired businesses after the plan to sell back certain business to Ms. Brown was abandoned. The allegations on this point are adequate to survive dismissal under Rule 12(b)(6).

### *Actionable Defamatory Statements*

The defendants next contend that the allegations of false statements are insufficient because the defendants are only accused of stating that MRI's business would

---

[8]     The defendants assert: "Plaintiff cannot simultaneously state a claim that Defendants took its business and meanwhile allege it was defamatory for Defendants to say they took the business." (Defs.' Reply at 8.) This is a distortion of the SAC's allegations. MRI does not allege that the defendants truthfully told MRI's customers that the Wendy Deal fell through, that they were starting another business, and that they would simply like to take on MRI's customers as clients. That might indeed be legitimate competition between businesses. The SAC instead alleges that the defendants lied to MRI's customers, telling them that MRI could no longer perform the services they needed and that AW and Ms. Brown had effectively purchased back the acquired businesses from MRI.

be in jeopardy without Ms. Brown or Mr. Berg. (MTD Mem. at 21–22.) Again, a close examination undermines this argument. Language supporting this argument appears nowhere in the SAC. Instead, the defendants appear to be placing their own gloss on the litigation and grafting it onto the SAC. To credit this argument would be both to read into the SAC allegations that are not present and to take inferences in the defendants' favor. Rule 12(b)(6) does not permit either analysis. While the defendants may be able to convince a fact finder that its version of these facts is correct, the Court declines to consider that alternative narrative at this stage.

For these reasons, the Court declines to recommend dismissal of Count IV of the SAC.

### G. Unjust Enrichment Claim (Count VII)

The defendants seek dismissal of the unjust enrichment claim in Count VII of the SAC. To plead an unjust enrichment claim a plaintiff "must establish an implied-in-law or quasi-contract in which the defendant received the benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). While a party may not recover for both breach of contract and unjust enrichment claims, a plaintiff is permitted to allege the claims as alternative theories of recovery until there is a conclusive decision "that a valid and enforceable contract exists between the parties which governs the specific dispute before the court." *Spectro Alloys Corp. v. Fire Brick Engineers Co.*, 52 F. Supp. 3d 918, 932 (D. Minn. 2014); *see also* Fed. R. Civ. P. 8(a)(3).

The defendants argue that SAC fails to allege what each individual defendant received, particularly highlighting an absence of allegations regarding Mr. Batinich and Mr. Brown. (MTD Mem. at 23; Defs.' Reply at 8.) The Court finds that the defendants are once again overlooking relevant allegations in the SAC. Mr. Batinich is adequately alleged to have received a benefit through his unlawful removal of MRI's business information for future use as an employee of MRI. (SAC ¶¶ 31, 65, 71.) Mr. Brown allegedly owns AW with Ms. Brown. (SAC ¶ 6–7.) The gravamen of the SAC is that AW and the Browns received substantial benefit through a series of fraudulent actions, as opposed to legitimate competition, designed to take employees and customers of businesses that MRI acquired from Mr. Brown and others in September 2017. The Court finds this is adequate to identify the benefits the individual defendants are alleged to have wrongfully received.

The defendants also argue that the unjust enrichment claim should be dismissed because there are enforceable contracts that make recovery for unjust enrichment impossible. (MTD Mem. at 23–24.) It is permissible, at this stage, for the SAC to include both breach-of-contract claims and an unjust-enrichment claim as alternative theories because there has been no conclusive determination that a valid and enforceable contract exists between the parties. *Spectro Alloys Corp.*, 52 F. Supp. 3d at 932; Fed. R. Civ. P. 8(a)(3). Accordingly, the motion to dismiss the unjust enrichment claim should be denied.

20

### H. Misappropriation of Trade Secrets Claim (Count XI)

The defendants argue that the misappropriation-of-trade-secrets claim in Count XI of the SAC must be dismissed because MRI failed to plead facts supporting the existence of a trade secret. (MTD Mem. at 23–26.) Count XI of the SAC asserts that AW, Mr. Batinich and Ms. Brown violated the Defense Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, et seq., and the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325C.01–.08. (SAC ¶¶ 149–58.)

To prevail on a misappropriation claim under the DTSA, a plaintiff "must show both the existence and the misappropriation of a trade secret." *CPI Card Group, Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018). "A defendant is liable for misappropriation of a trade secret [under the MUTSA] if the defendant has acquired the trade secret through improper means." *Wyeth v. Natural Biologics, Inc.*, 395 F.3d 897, 900 (8th Cir. 2005). A trade secret is information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Minn. Stat. § 325C.01, subd. 5; *see also* 18 U.S.C. § 1839(3) (providing that information is a trade secret if the owner "has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information").

21

The defendants rely on *Hot Stuff Foods, LLC v. Dornback*, 726 F. Supp. 2d 1038 (D. Minn. 2010), to support their argument that MRI failed to adequately allege the existence of a trade secret. The *Hot Stuff* court concluded that the plaintiff just parroted the elements of the claim and held that "[m]erely stating that the information is confidential is insufficient." *Id.* at 1044. Instead, the plaintiff needed to "set forth facts showing that the information had independent economic value due to its secrecy, was not readily ascertainable by others, and that [the plaintiff] took efforts to maintain its secrecy." *Id.*

In this case, the SAC contains sufficient factual allegations to render *Hot Stuff* inapposite. For example, the SAC explains how the acquired businesses use a "unique" and "proprietary system" that has economic value. (SAC ¶ 18.) Among the information that was allegedly taken at the defendants' direction was a spreadsheet with contact information for over 4,400 clients of the Jeane Thorne division of the business that "belong[ed] to MRI." (SAC ¶ 148.) The SAC describes the documents and other information that was allegedly misappropriated by the defendants or at their direction as requiring "administrator privileges" to access. (SAC ¶ 151.) Mr. Batinich allegedly downloaded "proprietary information related over 5,000 MRI customers, MRI forms and databases, substantial private and confidential employee databases … and other sensitive and confidential information." (SAC ¶ 146.) In several places, the SAC identifies specific pieces of information by file name or title that were allegedly misappropriated by the defendants. (SAC ¶¶ 146, 151.) MRI also alleges facts concerning its efforts to protect information through the use of "password protection, physical limitations such as locked

doors and limitations on access by employees within the organizations, as well as by the use of non-disclosure and confidentiality clauses within MRI's contracts with its customers." (SAC ¶ 33.) These allegations, though perhaps not as detailed as possible in some respects, are sufficient to give notice to the defendants of the basis on which MRI claims that the information taken constituted trade secrets within the meaning of the MUTSA and the DTSA. *See TE Connectivity Networks, Inc. v. All Systems Broadband, Inc.*, No. 13-cv-1356 (ADM/FLN), 2013 WL 6827348, at *4 (D. Minn. Dec. 26, 2013) (concluding that "somewhat vague" allegations were nevertheless sufficient to state a trade secrets claim "when the allegations are viewed as a whole"); *Matson Logistics, LLC v. Smiens*, No. 12-cv-400 (ADM/JJK), 2012 WL 2005607, at *10 (D. Minn. June 5, 2012) (concluding that similar allegations were sufficient to state an MUTSA misappropriation of trade secrets claim).

Accordingly, the motion to dismiss the misappropriation-of-trade-secrets claim in Count XI of the SAC should be denied.

## I.   Breach of Stock Purchase Agreement and Rule 12(b)(3)

The defendants argue that two claims for breach of the Stock Purchase Agreement in Counts VIII and X of the SAC must be dismissed pursuant to Rule 12(b)(3) because they are subject to a forum-selection claim in the contract requiring that they be litigated in Chicago. (MTD Mem. at 26–27.) The Stock Purchase Agreement contains a forum-selection clause requiring either federal or state litigation to take place in Chicago. (Stock Purchase Agreement § 9.7.)

A motion to transfer venue under 28 U.S.C. § 1404(a) is a more appropriate vehicle for enforcing a forum-selection clause than a motion to dismiss under Rule 12(b)(3). *Ragovsky Enterprise, Inc. v. Masterbrand Cabinets, Inc.*, 88 F. Supp. 3d 1034, 1040 (D. Minn. 2015) (citing *Atl. Marine Const. Co., Inc. v. U.S. District Court for the Western District of Texas, et al.*, 571 U.S. 49, 60–61 (2013)); *Steward v. Up North Plastics, Inc.*, 177 F. Supp. 2d 953, 957 (D. Minn. 2001). The defendants do not argue that the District of Minnesota is actually an "improper" venue for this action pursuant to 28 U.S.C. § 1391. The Court will not further consider whether dismissal is appropriate under Rule 12(b)(3).[9] *See Ragovsky*, 88 F. Supp. 3d at 1041 (analyzing first whether Minnesota is a proper venue under § 1391 "without regard to the forum-selection clause").

In light of this precedent, the Court will construe the defendants' argument to be one for transfer of venue pursuant to 28 U.S.C. § 1404(a). However, the Court declines to transfer venue to a Chicago forum at this stage because the parties and this Court have already invested significant effort and resources litigating the matter here. And although the defendants could have raised the issue of the forum-selection clause much sooner, they waited until now to do so. A claim for breach of the Stock Purchase Agreement was first alleged in the First Amended Complaint, which the defendants answered on December 5, 2017. (First Am. Compl., ECF No. 59; Defs.' Answer to First Am. Compl., ECF No. 72.) The defendants did not raise any objection to venue in that answer, nor did

---

[9]   The defendants state that the breach-of-contract claims should be dismissed with prejudice, but offer no support for such a disposition of these claims. (Dismissal Mem. at 27.)

they file a motion to transfer venue at that time. Moreover, MRI originally sued

Mr. Batinich in the Northern District of Illinois, he requested that his case be transferred

to the District of Minnesota, and that request was granted so that the Illinois litigation

could be consolidated with this case. *Management Registry, Inc. v. Batinich*, No. 18-cv-

1147-JRT-KMM, Doc. Nos. 19, 55. Transferring a portion of this case regarding the

alleged breach of the Stock Purchase Agreement by Mr. Brown would be antithetical to

judicial economy and a waste of the parties' resources. *See Steward*, 177 F. Supp. 2d at

959–60 (declining to transfer litigation that had been pending for several years based on

concerns for judicial economy).

### J.   Indemnification Claim (Count X)

The SAC alleges that in Section 8.2 of the Stock Purchase Agreement, the sellers,

including Mr. Brown, agreed to indemnify MRI against "any and all Losses incurred or

sustained by, or imposed upon, [MRI] based upon, arising out of, with respect to or by

reason of … any breach or nonfulfillment of any covenant, agreement or obligation to be

performed by Sellers pursuant to th[e] Agreement." (SAC ¶ 147; Stock Purchase

Agreement § 8.2.) MRI alleges that Mr. Brown violated his agreement to abide by

noncompete and nonsolicitation restrictions pursuant to § 6.5 of the Stock Purchase

Agreement and that he is required to indemnify them for the losses incurred as a result of

those violations. (SAC ¶ 148.)

The defendants contend that MRI's indemnification claim fails under the plain

language of the Stock Purchase Agreement requiring that notice must be given to Brown

within one year of the closing. (MTD Mem. at 27 (citing Stock Purchase Agreement

25

§ 8.5).) However, the defendants fail to explain why an indemnification claim falls within this notice provision through any analysis of the contract's language or exploration of relevant authority. The Court declines to analyze this argument in more detail than the defendants chose to employ.

The defendants also argue that this claim should be dismissed because no damages have been alleged that are not expressly excluded by § 8.4 of the agreement. (MTD Mem. at 28.) That provision provides that:

> In no event, shall an Indemnifying Party be liable to an Indemnified Party for any punitive, incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement, or diminution in value or any damages based on any type of multiple.

(Stock Purchase Agreement § 8.4(e).) All the defendants offer on this point is to state: "In this case all of the alleged damages fit these excluded categories. The sparsely pled damages are limited to consequential future lost income and that is it." (MTD Mem. at 28; *see also* Defs.' Reply at 11 ("In its Second Amended Complaint Plaintiff does not allege any harms or losses that do not fit these categories").)

For three reasons, the Court finds this argument unpersuasive. First, the defendants leave it to the Court to fill in the blanks about why the language of the Stock Purchase Agreement supposedly forecloses the plaintiff's particular indemnification claim. The Court declines to come up with the rationale for dismissal on this point when the defendants did not do so. Second, the defendants do not point to any language in the SAC that limits the damages sought to consequential future lost income. And third, the question of whether the plaintiff's alleged damages fall within the excluded categories of

26

this provision of the Stock Purchase Agreement is better resolved at summary judgment, or if necessary, by the fact finder after a trial. Defendants cite no case law indicating that such a breach-of-contract damages question should be resolved on the pleadings.

Finally, the defendants argue that the indemnification claim should be dismissed "because it is expressly limited to amounts set off from the purchase price which was paid." (MTD Mem. at 28 (quoting Stock Purchase Agreement § 8.7.) Again, the defendants do nothing more than cite a provision of the agreement and state their argument in a conclusory fashion. The Court will not endeavor to put flesh on the bare bones of this suggestion.

### K. Breach of Contract Claim Against Mr. Batinich (Count VIII)

The defendants assert that the breach of contract claim against Mr. Batinich must be dismissed because MRI seeks to enforce convenants in an agreement he entered with MMDK, Inc., that could not be assigned to MRI. (MTD Mem. at 29–30.) They argue that Mr. Batninich's employment agreement with MMDK, Inc., prohibits any assignment to MRI because the contract did not refer to successors. (*Id.*) Mr. Batinich's employment agreement with MMDK (one of the businesses that MRI acquired from Mr. Brown and the other sellers) does not include express language either permitting or prohibiting assignment of the contract to MMDK's successor. (Batinich Agreement, Ex. C to Mot. to Dismsis, ECF No. 266-3.) The SAC alleges that "[t]he Batinich Agreement was assigned to MRI pursuant to the Asset Purchase Agreement dated September 11, 2017." (SAC ¶ 31.)

Under Illinois law,[10] an employer may assign a restrictive covenant, such as a non-compete agreement, to a corporate purchaser, even in the absence of explicit contract language. *AutoMed Technologies, Inc. v. Eller*, 160 F. Supp. 2d 915, 923–24 (N.D. Ill. 2001) (holding that a corporate acquirer may enforce restrictive covenants in employment contracts against employees where the agreements are silent on the issue of assignment); *see also Unisorce Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977, 981–82 (C.D. Ill. 2003) (adopting the rational of *AutoMed*); *Guidant Sales Corp. v. George*, 2001 WL 1491317, at *6 (D. Minn. 2001) (concluding that a non-compete agreement could be enforced by corporate successor against employee and citing *AutoMed*). Based on this case law and the allegations in the SAC, the Court rejects the defendants' argument that the breach-of-contract claim in Count VIII must be dismissed based on the absence of an express assignment or successor clause in the Batinich Agreement.

### L.  Duty of Loyalty Claim (Count IX)

The defendants next argue that MRI's breach-of-duty claim against Mr. Batinich "fails as a matter of law because he was never employed by MRI" and the allegations that he was are "wholly conclusory." (MTD Mem. at 30.) Defendants' position, which consists of one paragraph, is completely unsupported by citations to the record, references to supporting caselaw, or any reasoned argument.

---

[10]     The Batinich Agreement with MMDK states: "[t]he terms of this Agreement shall be construed in accordance with the laws of the State of Illinois applicable to agreements made in Illinois." (Batinich Agreement § 6.4.) The defendants rely on the District Court's decision in *GreatAmerica Leasing Corp. v. Dolan*, No. 10-cv-4631 (JRT/JJK), 2011 WL 334829, at *5 (D. Minn. Jan. 3, 2011), to support the argument that the Batinich Agreement cannot be assigned to MRI as a result of the acquisition. However, *Dolan* did not involve a contract governed by Illinois law and the defendants do not explain why it applies in this case.

The SAC alleges that "Mr. Batinich accepted employment with MRI, under the terms of the acquisition, as Director of Sales, as a W-2 employee of AllStaff, Inc…." (SAC ¶ 31.) It is difficult to comprehend what more the defendants believe is necessary to adequately plead an employment relationship between a plaintiff and defendant than an allegation that a defendant was an employee of the plaintiff's business. Here, the defendants clearly have notice of the basis for the allegation that Mr. Batinich was MRI's employee and violated his duty of loyalty. After he became employed by MRI, he is accused of breaching the duty of loyalty by engaging in conduct for the benefit of the other defendants. (SAC ¶¶ 28–33, 136–45.) These allegations are sufficient to assert a duty-of-loyalty claim and the Court will not recommend dismissal of Count IX of the SAC. If the defendants are alleging that, factually, this claim must fail because Mr. Batinich was not an employee of MRI, that is an argument properly made to the fact finder in this case.

### M. Conversion Claim (Count I) and Civil Theft Claim (Count XIII)

The defendants assert that the conversion claim in Count I and the civil-theft claim in Count XIII of the SAC should be dismissed. A claim for conversion under Minnesota law lies where the defendant engages in "an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use or possession." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997). A civil-theft claim is governed by Minn. Stat. § 604.14. Section 604.14 provides that "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater." *Id.* § 604.14, subd. 1.

### *Specific Identification of Property*

The defendants argue because "MRI has completed sufficient discovery so that it could plead exactly what was 'stolen' if anything was taken so there's no sense in waiting for a Motion for Summary Judgement to dispose of these two claims." (MTD Mem. at 30–33.) The Court disagrees.

Contrary to the Defendants' argument, the SAC adequately alleges the property that the defendants are accused of having taken from MRI. The SAC identifies "at least 78 internal computers, all of the 'in-home" computers utilized by the temporary staff (at least 200 computer terminals, 400 monitors, and 200 headsets), and thousands of confidential and proprietary materials and documents (electronic)." (SAC ¶ 94; *see also id.* ¶ 90.) The Court will not recommend dismissal of Counts I and XIII.

### *Absence of Justification*

The defendants also contend that MRI has not alleged facts showing that the defendants' actions with regard to the property were not legally justified. (MTD Mem. at 32.) Again, the defendants' argument is unavailing. The SAC alleges that Mr. Brown and Mr. Batinich stole physical property from MRI and that Ms. Brown directed others to take MRI's confidential information out of MRI's office suite in boxes. (SAC ¶¶ 58–59, 91.) Coupled with the allegations that the defendants were falsely representing that Ms. Brown and AW had purchased portions of the acquired businesses back from MRI, the SAC provides a sufficient basis for the Court to infer that the taking of MRI's property lacked justification.

For these reasons, the motion to dismiss Counts I and XIII of the SAC should be denied.

### N.  Civil Conspiracy Claim (Count XII)

The defendants argue that MRI's claim for civil conspiracy in Count XII of the SAC should be dismissed "as superfluous" because Minnesota law only recognizes such a claim as a means of imposing joint and several liability against multiple defendants. (MTD Mem. at 33–34.) The defendants' reply clarifies that they are arguing this civil-conspiracy claim "fails because the underlying tort claims fail." (Defs.' Reply at 14.) The Court has not concluded that any of the underlying tort claims fail based on the pleadings alone and therefore declines to recommend dismissal of Count XII as superfluous.

### O.  Speculative Damages

Finally, the defendants argue that every one of MRI's claims in the SAC ought to be dismissed because it fails to plead that MRI suffered any damages that are not speculative. (MTD Mem. at 34.) This argument is unsupported by any citation to case law dismissing a complaint for failure to state a claim based on the speculative nature of claimed damages. The Court will not recommend dismissal of any claims based on this argument.

### P.  Conclusion

For the reasons discussed above, the Court concludes that the motion to dismiss should be denied.

II.     **Motion to Strike**

In their motion to strike, the defendants assert that MRI's request for punitive

damages should be removed from the SAC because MRI failed to make a motion to

amend, pursuant to Minn. Stat. § 549.191, and because the evidence does not support a

claim for punitive damages. (Strike Mem. at 3–8.) Rule 12(f) provides that "[t]he court

may strike from a pleading an insufficient defense or any redundant, immaterial,

impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). As discussed below, the Court

recommends that the motion to strike be denied.

This is not the first time that the issue of pleading punitive damages has been

addressed in this case. MRI previously moved to amend its First Amended Complaint and

to add a claim for punitive damages after the defendants sought judgment on the

pleadings. MRI supported that motion to amend by reference to several affidavits. (ECF

Nos. 206–12.) However, the Court did not rule on MRI's motion to amend because the

parties agreed to a procedure by which the plaintiff's proposed amended claims could be

addressed more efficiently. (ECF Nos. 244, 250.) Namely, the parties agreed that MRI

could file its Second Amended Complaint and, if desired, the defendants could move to

dismiss any claims they believed were inadequately pled. (ECF No. 250.)

In support of their motion to strike, the defendants cite several cases from this

District applying Minn. Stat. § 549.191 to motions to add punitive damages, which is

sometimes referred to as the "gatekeeping statute." Though these cases consistently held

that a party seeking to allege punitive damages under Minnesota law was required to

make a motion conforming to the gatekeeping statute,[11] that proposition has recently been rejected by a number of decisions holding that the gatekeeping statute's evidentiary standard is inapplicable in federal court.[12] *See, e.g., In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, MDL No. 15-2666 (JNE/FLN), 2017 WL 5187832 (D. Minn. July 27, 2017) (concluding that the gatekeeping statute's standard governing amendment is inapplicable in federal court because it conflicts with the standards of Fed. R. Civ. P. 15); *see also Shank v. Carleton College*, No. 16-cv-1154 (PJS/HB), 2018 WL 4961472, at *4 (D. Minn. Oct. 15, 2018) (collecting cases). Instead, these cases hold that the standards governing a futility challenge to a motion to amend under Fed. R. Civ. P. 15 must be applied to determine whether a pleading adequately alleges a basis for recovery of punitive damages. *Shank*, 2018 WL 4961472, at *4 ("[T]he Court is required to view the [proposed second amended complaint] through the permissive Rule 15 lens, but must nevertheless determine whether it states a plausible claim for punitive damages in light of substantive Minnesota law.")

Given the recent shift in the case law and the procedural history discussed above, the Court concludes that the question of the propriety of pleading punitive damages in this case should be analyzed as though MRI had filed a motion to amend and the defendants raised a futility challenge. Considering the allegations under that framework,

---

[11]    *See, e.g., Ulrich v. City of Crosby*, 848 F. Supp. 861 (D. Minn. 1994).

[12]    At least one of these more recent cases has questioned whether the gatekeeping statute's requirement that a party must move to amend, rather than simply requesting punitive damages in an initial pleading, should be applied in federal court. *Rogers v. Mentor Corp.*, No. 12-cv-2602 (SRN/SER), 2018 WL 2215519, at n.16 (D. Minn. May 15, 2018) (noting that the gatekeeping statute's prohibition on including punitive damages in an initial complaint may conflict with Fed. R. Civ. P. 8 and 9).

the Court has determined above that the SAC adequately alleges several torts where punitive damages may be recoverable. The Court further concludes that the SAC contains sufficient facts, accepted as true, that state a plausible claim for punitive damages under Minnesota law. Accordingly, the Court concludes that the defendants' motion to strike should be denied.

## III.   Recommendation

Based on the discussion above, **IT IS HEREBY RECOMMENDED THAT:**

1. Defendants' Motion to Dismiss Pursuant to 12(b)(6) and 12(b)(3) **(ECF No. 255)** should be **DENIED**.

2. Defendant's Motion to Strike **(ECF No. 256)** should be **DENIED**.

Date: September 12, 2019                    *s/Katherine Menendez*
                                            Katherine Menendez
                                            United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.