### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

MANAGEMENT REGISTRY, INC.,

                                                    Civil No. 17-5009 (JRT/DTS)

                            Plaintiff,

v.                                      **MEMORANDUM OPINION AND ORDER
                                        GRANTING IN PART AND DENYING IN
A.W. COMPANIES, INC., ALLAN K.          PART THE PARTIES' MOTIONS FOR
BROWN, WENDY BROWN, and MILAN           SUMMARY JUDGMENT**
BATINICH,

                            Defendants.

Anna Koch, Nicholas N. Sperling, and V. John Ella, **TREPANIER MACGILLIS BATTINA, PA,** 8000 Flour Exchange Building, 310 South Fourth Avenue, Minneapolis, MN 55415; James M. Morris, **MORRIS & MORRIS P.S.C.**, 217 North Upper Street, Lexington, KY 40507, for Plaintiff.

Donald M. Lewis, Joel Andersen, and Katie M. Connolly, **NILAN JOHNSON LEWIS PA,** 250 Marquette Avenue, Suite 800, Minneapolis, MN 55401, for Defendants.

Plaintiff Management Registry, Inc. ("MRI") alleges a myriad of claims against A.W. Companies, Inc. ("A.W."), Allan and Wendy Brown, and a former MRI employee, Milan Batinich (collectively "Defendants").   The core allegation asserts that Allan Brown orchestrated the sale of several companies to MRI and then aided his wife, Wendy Brown, in stealing several of those companies from MRI.   MRI also alleges that Allan and Wendy Brown, with the assistance of Milan Batinich, pilfered customers, hardware, employees, and other materials from MRI while establishing A.W. as a rival company to MRI.   The

parties now move for summary judgment on 19 separate claims—12 of the Plaintiff's claims and 7 of the Defendants' counterclaims.

For the reasons set forth below, the Court will grant in part MRI's motion for summary judgment on Count III of its Second Amended Complaint as it relates to statements MRI made to its IT vendor and Count VII as it relates to Allan Brown's Breach of Contract.  The Court will also grant MRI's motion as to Counts II, VIII, and X of Defendants' Counterclaims and will deny the motion on the remaining claims.  The Court will grant in part Defendants' motion on Count II of MRI's Second Amended Complaint as it relates to Allan Brown's acceptance of the alleged broker's fee, Count VIII as it relates to Batinich's alleged breach of contract, and on Counts III, IV, V, VII.  The Court will deny Defendants' motion as to all remaining claims.

## BACKGROUND

### I.   FACTUAL BACKGROUND[1]

MRI is a recruiting and staffing company that offers a "full suite of workforce solutions" to its clients.  (Decl. of Tim Malone ¶ 3, Nov. 15, 2017, Docket No. 37.)  MRI is

---

[1] While the parties each insist that their version of events is undisputed, it is apparent that the parties' approach to developing the facts in their briefs was heavily infused with ad hominem vitriol.  Frequently, the prospect of providing the facts in coherent narrative style is entirely abandoned in favor of inundating the Court with bullet points and tables highlighting bits and pieces of the record supporting their arguments.  Moreover, many of the parties' factual assertions are either unsupported by record citations or the parties only generally cite to voluminous exhibits.  "Without some guidance, [the Court] will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments."  *Rodgers v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006).  Although the Court has thoroughly reviewed the

owned by Joe Malone, the founder, and two of Joe Malone's sons, Tim and Terry Malone. (*Id.*)

Allan Brown was the president and part owner of a suite of companies collectively referred to as AllStaff including, as relevant here, the Minnesota based non-industrial divisions of AllStaff known as AllStaff Recruiting Inc. (referred to herein as the "Minnesota Businesses"). (Decl. of Katie Connolly ("1st Connolly Decl."), Ex. 1 ("Allan Brown Dep.") at 8, Jan. 14, 2022, Docket No. 608.) Mary and Mel Zwirn were also part owners of AllStaff alongside Allan Brown. (*Id.* at 12.)

In 2016, due to Mel Zwirn's declining health, the Zwirns contemplated selling AllStaff to the Malones. (*Id.* at 116.) Allan Brown and the Malones negotiated the sale of AllStaff via a Stock Purchase Agreement ("SPA"), and the sale closed in September of 2017. (1st Connolly Decl., Ex. 5 ("SPA").)

Early in the sale process, Allan Brown and the Malones discussed selling the Minnesota Businesses to Allan's wife, Wendy Brown (the "Minnesota Deal"). (Allan Brown Dep. at 26–27; 1st Connolly Decl., Ex. 4, ("Tim Malone Dep.") at 7.) Under the terms of the sale, Allan Brown would continue to serve as the president of the AllStaff companies, "other than the non-industrial business of AllStaff Recruiting, Inc." (Corrected Decl. James M. Morris ("Morris Decl."), Ex. 4, May 4, 2022, Docket No. 636.) Defendants

---

record in this case, the Court expects the parties and their attorneys to exhibit a higher degree of professionalism and etiquette than they have displayed to date.

assert that Allan Brown and Tim Malone agreed that MRI would purchase the Minnesota Businesses, and then sell them to Wendy Brown within 30 days of the SPA's closing date, but the deal never materialized.  (Allan Brown Dep. at 154, 158–59.)

In early September 2017, MRI took possession of AllStaff.  (1st Connelly Decl., Ex. 17.)  The management of the Minnesota Businesses between September and November 2017 and the facts relating to the dissolution of the Minnesota Deal are disputed by the parties.  However, between September and November 2017, Wendy Brown operated in a leadership role in the Minnesota Businesses.  (*See id.*, Ex. 18 at 54, Ex. 14 at 63, Ex. 19 at 16) (Minnesota Businesses' employees testifying either that they believed MRI was not their employer or that they worked under Wendy Brown).)

MRI claims that the Browns began a subversive movement to seize control of the Minnesota Businesses prior to the closing of the SPA.  It insists that Allan Brown intentionally took advantage of the fact that MRI would not notice what was happening with the Minnesota Businesses because it had just gone through an acquisition that nearly doubled its size and covertly ushered his wife into an ownership position.

MRI asserts that Allan Brown was hesitant to initially inform customers, vendors, and employees of the acquisition stating that there should be "[n]o published announcement or very little fanfare to start.  Let us get transition complete . . . to make sure clients don't feel a thing."  (Morris Decl., Ex. 10.).  MRI also claims the Browns "utilized MRI's FAQ/Announcement [regarding the acquisition] to manufacture a fake

-4-

FAQ/Announcement [to be issued to the Minnesota Businesses] . . . claiming 'Eric Berg and a new partner, Wendy Brown ha[d] purchased'" the Minnesota Businesses.  (Pl.'s Mem. Supp. Mot. Summ. J., at 7–8, Jan. 14, 2022, Docket No. 601; Morris Decl., Ex. 15). MRI insists that the fake announcement was intended keep MRI uniformed of the Minnesota Businesses.  MRI cites several instances where the Browns along with  Berg— who, according to MRI, the Browns misled into believing Wendy owned the Minnesota Businesses—blocked their employees from signing any MRI employment agreements or agreeing to any MRI restrictive covenants.  (Morris Decl. Exs. 25–29.)

In late October and early November of 2017, the Browns and Eric Berg dissolved many of the Minnesota Businesses' contracts with its customers who, in turn, entered into contracts with A.W.  (Decl. of Laura McKnight, Ex. 12, Nov. 3, 2017, Docket No. 10; Am. Decl. of James Morris, Exs. 1–4, Nov. 20, 2017, Docket No. 55.)  Importantly, Berg played the lead role in the dissolution of the Minnesota Businesses' contracts and the transfer of information and equipment from the Minnesota Businesses to A.W.  (*See* Am. Decl. James Morris, Exs. 1–4.)

The Defendants' factual narrative starkly contrasts MRI's depiction.  Defendants allege emails exchanged between Allan Brown and MRI's ownership and executives directly reference Wendy Brown as a go to person in the Minnesota Businesses, (Morris Decl., Ex. 15), and argue that MRI executives did not oppose the mention of Wendy Brown playing a leading role.  (*See, e.g., id.*, Ex. 10.)   Defendants also assert that the

FAQ/Announcement issued to the Minnesota Businesses was neither fake nor issued by the Browns. Instead, they claim it was issued by an employee of the Minnesota Businesses at the direction of Berg. (1st Connolly Decl., Ex. 28 at 148–49, 155–56, 161–62.) Moreover, Defendants insist that the Malones and Allan Brown agreed to the decision to prevent the Minnesota Businesses employees from signing MRI paperwork. (2nd Decl. of Katie Connolly ("2nd Connolly Decl."), Ex. 35, Jan. 27, 2022, Docket No. 612.) Finally, the Defendants argue Eric Berg was not misled by the Browns and was fully aware that Wendy Brown was not the owner of the Minnesota Businesses and that there was an agreement that she would become the owner in the future. (1st Connolly Decl., Ex. 3 at 57.)

While the Court cannot resolve fact disputes at the summary judgment stage, and does not attempt to do so here, the record establishes that by the end of October 2017, the Minnesota Deal fell apart. (Decl. of Wendy Brown ¶¶ 27–29, Nov. 10, 2017, Docket No. 25.) Shortly after learning that the deal had collapsed, the Browns set about creating their own institution, A.W., and Allan Brown resigned from his position at MRI. (Morris Decl., Ex. 41.) It is also uncontradicted that the Browns accessed and utilized a great deal of data and information from the Minnesota Businesses to form A.W. (*Id.*, Exs. 57–60.)

However, Wendy Brown's role in the Minnesota Businesses prior to this point is unclear. More specifically, it is unclear if MRI was aware of her role and therefore

condoned it or whether Allan Brown inappropriately included her in the management of the Minnesota Businesses.

It is also unclear whether Berg was acting at the direction of the Browns or of his own volition. Notably, while MRI states that the Browns misled Berg into believing they were the rightful owners of the Minnesota Businesses, the record indicates that Allan Brown informed Berg that the Malones were the owners of the Minnesota Businesses, not the Browns, (Morris Decl., Ex. 78), and there is no evidence that the Defendants directed Berg to take any action—including cancelling MRI's contracts with its customers.

## 2. Relevant Sale Terms

Several specific terms of the SPA are relevant to the parties' summary judgment motions. The SPA prohibited Allan Brown from engaging or assisting others who were involved in competition with MRI, from inducing or encouraging actual or prospective clients to terminate or modify their relationship with MRI, or to solicit or hire any person who is offered employment by MRI or allow any affiliates to do so. (SPA § 6.5.) Any such action was prohibited for two years following the Closing Date. (SPA § 6.2(b).)

Section 4.15 of the SPA stated, "[n]o broker, finder or investment banker is entitled to any brokerage finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Sellers." (SPA § 4.15.) Section 4.16 of the SPA states, in brief, that Sellers make no further representations "[e]xcept for the

representations and warranties contained in this Article (including the related portions of the Disclosure Schedules)." (SPA § 4.16.)

Additionally, the SPA contained an indemnification clause which required the Zwirns and Allan Brown to indemnify MRI against "all Losses" incurred, sustained or imposed upon MRI "with respect to or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Sellers contained in this Agreement; or (b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Sellers pursuant to this Agreement." (SPA § 8.2.) The indemnification clause further states,

> **Offset of Purchase Price.** Notwithstanding anything to the contrary contained herein, Buyer's [MRI] sole recourse for indemnification from Sellers [Allan Brown and the Zwirns] shall be by way of an offset of the remaining portion of the Purchase Price payable under the Promissory Note. Such offset shall be applied on advance written notice to the Sellers of no less than 30 days.

(SPA § 8.7.)

## II.    Procedural Background

MRI brought an initial complaint against A.W., the Browns, and Berg.[2] (Compl. at 1, Nov. 3, 2017, Docket No. 1.) MRI immediately sought and was granted a preliminary injunction enjoining the Defendants from engaging in any advertising utilizing MRI's images or likeness or employing or soliciting MRI employees or customers. (Order

---

[2] Berg is no longer a defendant in this action. (Stip. Dismissal, Aug. 9, 2018, Docket No. 163.)

-8-

Granting Mot. Prelim. Inj., Nov. 3, 2017, Docket No. 16.)  Two weeks later, the Court found

that there were factual disputes "prevent[ing] the Court from finding that MRI [was] likely

to succeed on the merits of its claims."  (Order Vacating TRO at 1, Nov. 17, 2017, Docket

No. 53.)

MRI filed its First Amended Complaint shortly thereafter.  (First Am. Compl., Nov.

21, 2017, Docket No. 59.)  On May 17, 2019, Defendants moved for judgment on the

pleadings as to several of the counts in the First Amended Complaint.  (Mot. J. Pleadings,

May 17, 2019, Docket No. 204.)  On July 12, 2019, MRI filed its Second Amended

Complaint.  (Second Am. Compl., July 12, 2019, Docket No. 251.)  Defendants filed a

motion to dismiss the Second Amended Complaint on July 24, 2019.  (Mot. Dismiss Second

Am. Compl., July 24, 2019, Docket No. 255.)  Defendants also filed a motion to strike MRI's

additional claim of punitive damages.  (Mot. Strike, July 24, 2019, Docket No. 256.)  The

Magistrate Judge issued a Report and Recommendation ("R&R") on September 12, 2019,

recommending that the Court deny Defendants' motions.  (R&R at 34, Sept. 12, 2019,

Docket No. 298.)  The Court adopted the R&R, and the parties proceeded to discovery.

(Order Adopting R&R, Sept. 30, 2020, Docket No. 469.)  The parties then filed the pending

motions for summary judgment.  (Pl.'s Mot. Summ. J., Docket No. 589; Defs.' Mot. Summ.

J., Docket No. 605.)

**ANALYSIS**

## I.  STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial.  *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

## II.  DISCUSSION

### A. Count I: Conversion and Count XII: Civil Theft (All Defendants)

Both parties moved for summary judgment on Counts I and XIII for conversion and civil theft.  MRI argues that Defendants misappropriated MRI's possessions including computers, monitors, telephones, and headsets.  Defendants argue that the property

they took did not belong to MRI but rather belonged to one of MRI's clients who left MRI and became an A.W. client.  Additionally, A.W. asserts that it returned all contested property.

Conversion is "an act of willful interference with [the personal property of another], done, without lawful justification, by which any person entitled thereto is deprived of use and possession, and the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods." *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (citations omitted).  The elements of common law conversion are: "(1) plaintiff holds a property interest; and (2) defendant deprives plaintiff of that interest." *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003).

Civil theft is governed by Minn. Stat. §604.14, which provides that "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater."  Minn. Stat. § 604.14, subd. 1.  "'Property' means all forms of tangible property, whether real or personal[.]" Minn. Stat. § 609.52, subd. 1(1).

MRI asserts that that once A.W. was formed, Batinich directed former MRI employees to go to MRI's office in Madison, Wisconsin and take several computers and monitors to be used by A.W.

A.W. claims that the computers were not owned by MRI, but rather by MRI client Meijer.  (1st Connolly Decl., Ex. 59 ("A.W. Dep.") at 128–40.)  A.W. further argues that because MRI purchased the computers and related equipment, set them up, and then billed Meijer for the cost of doing so, Meijer therefore obtained title over the computers. (*Id.*)

MRI contends that although Meijer may have reimbursed MRI for purchasing and setting up the equipment, MRI retained title to the equipment.  (*Id.*, Exs. 72–73.)

In sum, the ownership of the equipment here is contested by the parties and the record simply does not establish who owned the equipment.  Because both conversion and civil theft require that MRI owned the allegedly stolen property, fact disputes preclude summary judgment and the Court will deny both parties' motions on Counts I and XII.

### B. Count II: Common Law Fraud (Allan Brown and Wendy Brown)

Both parties move for summary judgment on MRI's common law fraud claims against the Browns.  MRI argues that the Defendants attempted, from the start, to steal the Minnesota Businesses without ever compensating MRI.

To establish a common law fraud claims under Minnesota law, a plaintiff must show "(1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance

-12-

thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages." *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011).

MRI bases its claim on two allegations that (1) Allan Brown misled MRI into believing that he would not receive a broker's fee for negotiating the sale of the Zwirn's entities to MRI and (2) Allan and Wendy Brown misrepresented that Wendy owned the Minnesota Businesses without ever purchasing them.

Addressing MRI's allegation that Allan Brown misled it regarding the payment of a broker's fee, the SPA states that no broker would receive a broker fee for the sale of AllStaff to the Malones. (SPA § 4.15.) However, following closing of the deal, Allan Brown admitted to receiving a 1% "commission." (Morris Decl., Ex. 1 at 3.)

Notably, MRI fails to point to any record evidence indicating that Allan Brown made a false statement. Instead, MRI merely points to the provision of the SPA stating that no broker would receive a fee. While the parties raise various factual issues surrounding Allan Brown's payment, allegations that the payment violated the SPA rest in contract law—not common law fraud. Therefore, the Court will grant the Defendants' Motion for Summary Judgment on MRI's Common Law Fraud claim, to the extent that the claim relates to Allan Brown's alleged misrepresentation regarding a broker's fee.

Turning to the alleged misrepresentations that Wendy Brown owned the Minnesota Businesses, both parties point to communications between Allan Brown and various MRI executives that either (1) refer to the Minnesota Businesses as Wendy's

-13-

Company or (2) are important company-related messages that include and refer to Wendy Brown.  (*See, e.g.,*1st Connolly Decl. Exs. 23, 26, 29, & 35.)

MRI argues that these are instances of Allan Brown wrongfully incorporating Wendy Brown into conversations that she did not have a right to be in.  Additionally, MRI cites several instances where the Minnesota Businesses' employees thought or acted as though Wendy Brown was their employer.  (*See, e.g., id.*, Ex. 36 (financial questionnaire prepared by an MRI employee listing Wendy Brown as owner of the Minnesota Businesses); Morris Decl., Ex. 15 (announcement stating that Wendy Brown was one of the owners of the Minnesota Businesses).)

Defendants insist that these communications indicate that MRI executives were aware of Wendy's role and were not opposed to it.  The Defendants further argue that they did nothing to perpetuate any misconceptions and that they arose naturally from the expectation that Wendy Brown would become the owner in a matter of weeks.

Here, the Defendants' intentions, as well as their knowledge, in allegedly making any misleading statements are factual disputes precluding summary judgment.  Therefore, the Court will deny both parties' Motions for Summary Judgment on that portion of MRI's claim.

In sum, MRI may pursue a common law fraud claim based upon alleged misrepresentations related to Wendy Brown's ownership of the Minnesota Businesses

but is precluded from pursuing the claim regarding any statements related to any alleged "broker fee" paid to Allan Brown.

### C. Count VII: Unjust Enrichment (All Defendants)

Both parties move for summary judgment on MRI's claim for unjust enrichment. To state a claim for unjust enrichment, "the plaintiff must plead more than that 'one party benefit[ted] from the efforts or obligations of others,' but instead must allege 'that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully.'" *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 554 (8th Cir. 2008) (citing *First Nat'l Bank of St. Paul v. Ramer*, 311 N.W.2d 502, 504 (Minn. 1981). "So long as an adequate legal remedy exists, equitable remedies like unjust enrichment are not available." *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 854 (8th Cir. 2014) (citing *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996)).

Here, unjust enrichment is not appropriate because MRI has—and indeed is pursuing—sufficient contract and tort remedies. *See Johnson v. Res. Bancshares Mortg. Grp.*, No. 972378, 2000 WL 34424097, at *2 (D. Minn. May 15, 2000) (concluding that the plaintiffs' claim for unjust enrichment failed because they had an adequate remedy at law). Accordingly, the Court will grant the Defendants' Motion for Summary Judgment on MRI's claim for unjust enrichment.

### D. Count VIII: Breach of Contract (Allan Brown and Batinich)

The parties also move for summary judgment on MRI's breach of contract claims. MRI claims that Allan Brown and Batinich breached their contracts with MRI. The Defendants maintain that Allan Brown did not breach his contract, and even if he did, MRI is not entitled to damages in this action due to the terms the contract. Defendants further argue Batinich's contract is void because its non-compete clause is overly broad.

To establish a breach of contract, MRI must show "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Van Der Molen v. Wash. Mut. Fin., Inc.*, 835 N.E.2d 61, 69 (Ill. 2005).[3] The formation of a valid contract requires offer and acceptance, consideration, and definite and certain terms. *Village of South Elgin v. Waste Mgmt. of Ill., Inc.*, 810 N.E.2d 658, 669 (Ill. 2004).

### 1. Allan Brown's Contract

Under the terms of the SPA, Allan Brown is prohibited from engaging or assisting others who are involved in competition with MRI, from inducing or encouraging actual or prospective clients to terminate or modify their relationship with MRI, or to solicit or hire any person who is offered employment by MRI or allow any affiliates to do so for a period of two years following the closing date. (SPA §§ 6.2(b), 6.5.)

---

[3] The parties agree that the Allan Brown's contract is governed by Illinois law, and—as discussed below—the Court has already determined that Batinich's contract is also governed by Illinois law.

MRI argues that when Allan Brown assisted Wendy Brown with forming A.W., he assisted a company competing against MRI.  MRI argues that Allan Brown did not simply provide advice to Wendy Brown, but also contacted third party vendors to work with A.W., reached out to MRI clients such as Meijer, and helped with onboarding new employees.  (Morris Decl., Exs. 166, 187, 225, 260.)

Defendants argue that even if Allan Brown's actions could constitute a breach, MRI waived its right to sue because his work forming A.W. was done in tandem with MRI, with MRI's knowledge, and at the direction of MRI.

Even assuming that the Defendants are correct that MRI directed Allan Brown to assist Wendy Brown in preparation of her eventual takeover of the Minnesota Businesses, nothing in the record says they permitted either of the Browns to set up a separate competitive company.  Similarly, the record does not establish that MRI permitted Allan Brown to invite MRI's employees and customers to leave their employment or cancel their contracts with MRI in order to benefit a rival company.

Defendants alternatively argue that there are no damages available to MRI under the terms of the SPA and that MRI has not established the elements of a breach of contract claim.

Section 8 of the SPA contains an indemnification clause providing:

> **Offset of Purchase Price.**  Notwithstanding anything to the contrary contained herein, Buyer's sole recourse for indemnification from Sellers shall be by way of an offset of the remaining portion of the Purchase Price payable under the

> Promissory Note.  Such an offset shall be applied on advance
> written notice to the Sellers of no less than 30 days.

(SPA § 8.7.)

The Defendants assert that MRI exercised its right to an offset on May 2, 2018, after Allan Brown allegedly breached his contract, obtaining approximately $4.7 million still owed but which was released.  (Stip. re: Promissory Note, Jan. 14, 2022, Docket No. 600.)  However, MRI asserts that at the time of the breach, October 30, 2017, the Promissory Note was worth more than $5.8 million.  (*Id.*)  As such, MRI claims that it is entitled to the difference between the amount released in May 2018 and the actual amount owed at the time of the alleged breach in October 2017.

Because the Defendants failed to make any argument justifying Allan Brown's assistance in forming and acquiring clients for A.W. despite clear contractual language prohibiting him from aiding one of MRI's competitors, and because Defendants present no reason why MRI should not be entitled to the difference between the value of the Promissory Note at the time of breach and May 2, 2018, the Court will grant MRI's Motion for Summary Judgment and order Defendants to pay the difference between the value of the Promissory Note at the time of breach and May 2, 2018.

## 2. Batinich's Contract[4]

Next, the Court must consider the restrictive covenants in Batinich's contract to determine whether Batinich was in breach.

Section 4.3 of the Batinich's contract states:

> Employee shall not, for a period of twelve (12) months after the termination of Employee's employment with Company, directly or indirectly, work for, advise, manage, own or act as an agent or consultant for **or have any business connections or employment relationship,** with any entity or person that provides the same or similar services of the kind provided by Company to its Customers, located within a twenty mile radius of any office in which Employee worked during his or her employment with Company.

(1st Connolly Decl., Ex. 13 ("Batinich Contract") § 4.3 (emphasis added).)

Defendants assert that the covenants are unenforceable because they "unambiguously prohibit him from taking non-competitive roles." (Defs.' Mem. Opp. Pl.'s Mot. Summ. J. at 34, Feb. 11, 2022, Docket No. 621.)

Under Illinois law, agreements "which restrict the signor's ability to work for a competitor without regard to capacity have repeatedly been declared contrary to law." *Telxon Corp. v. Hoffman*, 720 F. Supp. 657, 665 n.7 (N.D. Ill. 1989) (citing *N. Am. Paper Co.*

---

[4] Defendants attempt to argue that Wisconsin law should apply to Batinich's contract because Batinich lives and works in Wisconsin. However, the Court has already considered the choice of law issues in this case and determined that Batinich's contract is governed by Illinois law. (Order Adopting R&R at 13 ("The Court is not free to ignore the terms of the contract, which specifies Illinois law, and instead rely on Minnesota law merely because there is no Illinois Supreme Court case on point.").)

Additionally, to the extent Defendants argue that the assignment of Batinich's contract to MRI renders the contract unenforceable, the Court has already addressed and rejected this issue. (*Id.*)

-19-

*v. Unterberger*, 526 N.E.2d 621, 623, (Ill. Cir. Ct. 1988) ("Unterberger is prohibited from associating with any competitor in any capacity whatsoever, even if Unterberger's job were merely menial and he had absolutely nothing to do with sales or purchasing."). Batinich's restrictive covenant is thus overbroad because it bars him from having any business connection or employment relationship with any competitor.

Regardless of the covenant's overbreadth, MRI may still maintain its breach of contract claim if § 4.3 is severable from the overall contract. "In general, 'courts which will enforce a contract with a portion severed generally do so when the severed portion does not go to the contract's essence.'" *Del Monte Fresh Produce, N.A., Inc. v. Chiquita Brands Int'l, Inc.*, 616 F. Supp. 2d 805, 818–19 (N.D. Ill. 2009) (quoting *People ex rel. Foreman v. Vill. of Round Lake Park,* 525 N.E.2d 868, 875 (Ill. App. Ct. 1988)).

In *Del Monte*, the Court refused to sever an overly broad non-competition clause because the contract contained language stating that it was essential to the contract. *Id.* at 819. Here, § 4.4 of Batinich's contract similarly states "these restrictions are necessary because Employee's position with Company would make it impossible for Employee to work for any competitive business without disclosing Company's Confidential Information, interfering with Company's Customer relationships, or otherwise violating Employee's obligations under this Agreement." (Batinich Contract § 4.4.) As such, the non-competition clause is an essential part of the contract and cannot be severed.

Accordingly, the Court will grant the Defendants' Motion for Summary Judgment as to Batinich's contract.

### E. Count IX: Breach of Duty of Loyalty (Batinich)

Both parties move for summary judgment on MRI's breach of duty of loyalty claim against Batinich. Under Illinois law, a plaintiff is required to establish "(1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. N. Am. Coro of Ill.*, 983 N.W.2d 414, 433 (Ill. 2012).

Here, MRI has not argued Batinich's alleged breach caused any injury. Nor does the record establish any evidence of harm that resulted directly from Batinich's alleged breach. MRI's failure to establish an element of their claim against Batinich undermines its claim. As such, the Court will grant Defendants' Motion for Summary Judgment on MRI's Breach of Duty of Loyalty Claim.

### F. Count XIII: Civil Conspiracy (All Defendants)

To demonstrate a civil conspiracy, a plaintiff must demonstrate that the defendants agreed to accomplish an unlawful purpose and took concerted actions to achieve that purpose. *Marty H. Segelbaum, Inc. v. Mw Capital, LLC*, 673 F. Supp. 2d 875, 880–81 (D. Minn. 2009) (citing *Harding v. Ohio Cas. Ins. Co.,* 41 N.W.2d 818, 824 (Minn. 1950)). Additionally, the defendants' actions must be based on an underlying intentional tort. *Id.*

Because MRI's civil conspiracy claims is dependent on underlying tort claims containing factual disputes, the Court will deny both parties' motions on MRI's claim.

### G. Count III: Malicious Injury (All Defendants)

Defendants also move for summary judgment on MRI's Malicious Injury claim. Under Minnesota law, a claim for "malicious wrong" is recognized as a distinct claim from defamation based on statements made by a defendant about a plaintiff's business. *Marudas v. Odegard*, 10 N.W.2d 233, 235 (Minn. 1943).  This claim requires allegations that "the defendant maliciously intended to injure the plaintiff by his words and succeeded in his malicious intent, and damage to the plaintiff was the direct result of the defendant's words, . . . whatever the nature of the words, provided they are untrue." *Id.*; *see also Keckhafer v. Prudential Ins. Co. of Am.*, No. 01-1017, 2002 WL 31185866, at *5 (D. Minn. Oct. 1, 2002) ("Thus, where a plaintiff alleges that a defendant maliciously intended to injure him or her by communicating false words and has succeeded in that malicious intent, and damage to the plaintiff is the direct result of the defendant's untrue words, a claim exists under Minnesota law upon which relief can be granted.").

Defendants argue that MRI relies on conjecture in asserting that the Defendants made false statements intended to harm MRI.  MRI contends that its Second Amended Complaint contains pleadings in minute detail that establishes facts sufficient to support its claim.

However, at the summary judgment stage, the nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256. MRI's reliance on its Second Amended Complaint does not constitute admissible evidence. Therefore, the Court will grant the Defendants' Motion for Summary Judgment on MRI's claim.

### H. Count IV: Business Defamation (All Defendants)

"Defamation under Minnesota law requires proof that the alleged defamatory statement (1) was communicated to someone other than the plaintiff, (2) was false, and (3) tended to harm the plaintiff's reputation and lower [the plaintiff] in the estimation of the community." *Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1142 (8th Cir. 2014) (quoting *Chambers v. Travelers Cos.*, 668 F.3d 559, 564 (8th Cir. 2012)) (alteration in *Thomas*). A false statement that "affects the plaintiff in his business, trade profession, office or calling . . . is defamation per se." *Id.* (quoting *Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 920 (Minn. 2009)) (alteration omitted). Statements of opinion are not actionable, but statements that "present or imply the existence of fact that can be proven true or false" are. *Id.* (quoting *Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1147 (8th Cir. 2012). Whether a statement is true or false is generally a jury question. *Id.* (citing *Keuchle v. Life's Companion P.C.A., Inc.*, 653 n.W.2d 214, 218 (Minn. Ct. App. 2002)).

Defendants argue that there is no evidence that they published any statement to entities other than MRI that caused harm to MRI's business. MRI contends Defendants

purportedly made statements to MRI clients and employees that MRI could no longer supply services that were outlined in the Second Amended Complaint.  However, MRI has not presented actual record evidence of these statements.  Instead, MRI highlights an incident with its client University of Minnesota Physicians ("UMP") where A.W. invoiced UMP for work performed by the Minnesota Businesses.  The record, however, fails to show that Defendants made statements about MRI to UMP.

Because MRI presents no evidence of statements the Defendants made about MRI, the Court will grant the Defendants' Motion for Summary Judgment on MRI's Business Defamation claim.

### I. Count V: Deceptive Trade Practices (All Defendants)

Defendants move for summary judgment on MRI's Deceptive Trade Practices Act ("DTPA").  They contend that because the sole remedy under the DTPA is injunctive relief and injunctive relief is not appropriate here because there is no longer any confusion in the market pertaining to MRI's ownership of Minnesota Businesses or the ownership and distinct nature of A.W.

The DTPA states that, "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable." Minn. Stat. § 325D.45, subd. 1. Because the DTPA provides relief for "a person likely to be damaged," it only provides injunctive relief "from future damage, not past damage." *Jaskulske v. State Farm Mut. Auto. Ins. Co.*, No. 14-869, 2014 WL 5530758, at *6 (D. Minn. Nov. 3, 2014) (quotation

omitted); *see also Chairez v. AW Distrib., Inc.*, No. 20-1473, 2021 WL 1600494, at *9 (D. Minn. Apr. 23, 2021) ("An injunction is the only available remedy for the Deceptive Trade Practices Act claim.").  As MRI has failed to produce evidence that it is likely to be harmed in the future, the DTPA's injunctive relief is unavailable.  Moreover, MRI has failed to establish any reason why the DTPA would apply in this situation or any fact that tends to show that the Defendants' actions are likely to cause the sorts of harm protected against by the DTPA.  *See* Minn. Stat. § 325D.44.  As such, the Court will grant the Defendants' Motion for Summary Judgment on MRI's DTPA claim.

### J. Count VI: Tortious Interference (All Defendants)

To establish a claim for tortious interference with contract, a plaintiff must prove "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998); *accord E-Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 664 (8ᵗʰ Cir. 2012).

While it is undisputed that MRI had several contracts with employees and with businesses that were breached, canceled, or otherwise dissolved around the time A.W. was incorporated, it is less clear who was responsible for the breach and whether any such breach was justified.[5]  Importantly, whether "interference is justified is ordinarily a

---

[5] The breach of one's own contract does not give rise to a claim of tortious interference with contract.  *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 901 (Minn. 1982).  Thus, insofar as Allan Brown's and Batinich's alleged breaches are concerned, MRI must prove that Wendy Brown or A.W. intentionally interfered with those contracts.

factual determination of what is reasonable conduct under the circumstances." *Kallok*, 573 N.W.2d at 362.

Here, Berg gave contradictory testimony pertaining to the role the Browns played in his decision to cancel several MRI contracts. (*Compare* 1st Decl. Eric Berg ¶ 37, Nov. 10, 2017, Docket No. 27, *with* 2nd Decl. Eric Burg ¶ 17, May 22, 2019, Docket No. 209.) Additionally, there is a factual dispute as to whether the Browns were aware of the details of the MRI contracts (other than Allan Brown's own contract). Because the justification of alleged interference with a contract is a factual issue and the pertinent facts here are unsettled, the Court will deny the Defendants' Motion for Summary Judgment on MRI's Tortious Interference claim.

### K. Count XI: Misappropriation of Trade Secrets (All Defendants)

To prevail on a misappropriation of trade secrets claim under the federal Defense Trade Secrets Act ("DTSA"), Pub. L. No. 114-153, 130 Stat. 376 (codified at 18 U.S.C. § 1836, et seq.) and the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. §§ 325C.01–.08, the plaintiff must prove (1) the existence of a trade secret possessed by the plaintiff and (2) misappropriation of the trade secret by the defendant.[6] First, to

---

[6] Because of their similarities, courts often analyze claims under the DTSA and MUTSA together. *See MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1017 n.1 (8th Cir. 2020); *Cambria Co. LLC v. Schumann*, No. 19-3145, 2020 WL 373599, at *3 (D. Minn. Jan. 23, 2020) ("The Court analyzes the claims together because the statutes have the same purpose and functionally the same definitions for key terms like 'trade secret,' 'misappropriation,' and 'improper means.'").

prove existence, the plaintiff must show (1) it possessed information that derived independent economic value from its secrecy; (2) the information was not readily ascertainable by others; and (3) it took reasonable steps to keep the information secret. 18 U.S.C. § 1839(3); Minn. Stat. § 325C.01, subd. 5; *Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 938–39 (D. Minn. 2019).  Second, to prove misappropriation, the plaintiff must show the defendant acquired, disclosed, or used a trade secret without the consent of its owner when the defendant either used improper means to acquire it or knew or should have known, at the time of disclosure or use, it had been acquired by improper means or from someone with a duty to maintain its secrecy.  18 U.S.C. § 1839(5); Minn. Stat. § 325C.01, subd. 3; *Protégé Biomedical*, 394 F. Supp. 3d at 939

Here, factual disputes persist as to whether MRI took reasonable steps to protect its trade secrets.  Defendants assert that MRI failed to take reasonable steps to maintain the secrecy of its information by permitting Wendy Brown to operate the Minnesota Businesses without requiring her to provide any sort of contractual assurances that she would not access or use that information.  MRI argues that Allan Brown effectively placed his wife into a position of leadership in the Minnesota Businesses without the consent of MRI and in dereliction of his duty as the President of MRI's newly acquired companies.  Because there is a genuine issue of material fact regarding whether MRI took reasonable steps to protect its trade secrets, the Court will deny the Defendants' Motion for Summary Judgment on MRI's claim.

**L. Counterclaim I: Breach of Contract**

MRI moves for summary judgment on Defendants' counterclaim for breach of contract.  Defendants assert that MRI breached an oral contract with Wendy Brown wherein it agreed to sell the Minnesota Businesses to her.  MRI raises two relevant arguments: the contract violates the statute of frauds, and the terms of the contract were nullified by the integration clause of the SPA.

### 1.    Statute of Frauds

Under the statute of frauds, any agreement that, by its terms, is not to be performed within one year from its making must be in writing or is void.  Minn. Stat. § 513.01.  The Browns claim an oral contract was formed wherein Wendy Brown would purchase the Minnesota Businesses contained a "material term[]" that "MRI would provide all "back-office functions [for the Minnesota Businesses] . . . for a five year term." (Decl. of Wendy Brown ¶ 4(b); Decl. of Allan Brown, ¶ 17(b), Nov. 10, 2017, Docket No. 26.)  However, separate documentation regarding the potential terms of the contract indicated that the back-office support agreement could terminate in less than one year if the Minnesota Businesses generated more than $50 million in profit within a year.  (Decl. Wendy Brown, Ex. 4 ¶ 3.).  Regardless of the probability of the Minnesota Businesses generating a $50 million profit in one year, the potential to satisfy the contract within one year renders the statute of frauds inapplicable.  *See Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 375–76 (Minn. Ct. App. 1984) (holding that the statute of frauds does not apply to a contract that can be performed within a year even if unlikely).  While

it is not certain what terms of the purported oral contract would govern at this point, or indeed whether such a contract existed, the facts on the record here are insufficient to find that the statute of frauds is applicable.

### 2. SPA Integration Clause

MRI also argues that any potential oral agreement is irrelevant because the SPA contained an integration clause stating that the Closing Documents "supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; and are not intended to confer upon any other person any rights or remedies hereunder."  (SPA, § 9.4.)  However, as Defendants point out, Wendy Brown was not a party to the SPA.  Thus, the SPA's integration clause has no bearing on the alleged contract between Wendy and MRI.

Because neither the statute of frauds nor the SPA's integration clause invalidate the potential contract between Wendy Brown and MRI, the Court will deny MRI's Motion for Summary Judgment on Defendants' Breach of Contract claim.

### M. Counterclaim II: Tortious Interference with Prospective Economic Advantage

MRI moves for summary judgment on the Defendants' tortious interference with prospective economic advantage claim.  To establish its claim, Defendants must show (1) a reasonable expectation of economic advantage, (2) that MRI knew of the expectation, (3) that MRI intentionally interfered with the economic advantage either in an independently tortious manner or in violation of a state or federal statute or regulation, (4) in the absence of the interference it was reasonably probable that the Defendants

would have realized the advantage, and (5) Defendants sustained damages. *Gieseke ex rel. Diversified Water diversion, Inc. v. IDCA, Inc.*, 844 NW.2d 210, 219 (Minn. 2014).

Here, Defendants' have not produced evidence that they were damaged by any alleged interference. Although Defendants allege they could theoretically produce evidence at trial, Defendants may not rest on mere allegations and, rather, must show based upon admissible evidence that specific facts creating a genuine issue for trial exist. *Anderson*, 477 U.S. at 256. Because Defendants have failed to produce such evidence, the Court will grant MRI's motion on the Defendants' claim.

### N. Counterclaim III: Defamation

The elements of defamation are: "(a) a false and defamatory statement about the plaintiff; (b) in unprivileged publication to a third party; (c) that harmed the plaintiff's reputation in the community." *Weinberger v. Maplewood Review*, 668 N.W.2d 667, 673 (Minn. 2003). Statements are defamatory per se if they contain false accusations of criminal behavior, false statements regarding the plaintiff's conduct of business, and imputations of a loathsome disease or unchastity. *Anderson v. Kammeier*, 262 N.W.2d 366, 372 (Minn. 1977). Defamation per se is "actionable without proof of actual damages . . . because statements that are defamatory per se are virtually certain to cause serious injury to reputation, and that this kind of injury is extremely difficult to prove." *Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 875 (Minn. 2019) (cleaned up).

Defendants allege that MRI defamed them first by telling A.W.'s client Meijer that Meijer must cease and desist from working with A.W. (Decl. of Katie Connolly in Opp.

("Connolly Decl. in Opp."), Ex. 29, Feb. 11, 2022, Docket No. 622-4.)  However, that is not a statement **about the Defendants**.  As such it is insufficient to sustain a defamation claim.

Defendants also claim that MRI defamed them by telling an MRI employee that Wendy Brown was stealing company files, and that MRI contacted one of A.W.'s IT vendors stating that Defendants stole MRI's trade secrets.  (Decl. of Wendy Brown, Ex. 13; Connolly Decl. in Opp., Ex. 23.)  Despite Defendants' contentions, the statements to the IT vendor did not contain any accusations about Defendants.  Instead, MRI asked the IT vendor not to share any of MRI's trade secrets with A.W.  (Connolly Decl. in Opp., Ex. 23.)  That does not constitute defamation because it is not a statement about Defendants.  However, MRI's statements to its own employee are sufficient to establish the publication prong of Defendants' claim.  *Frankson v. Design Space Int.,* 394 N.W.2d 140, 144 (Minn. 1986).  Accordingly, the Court will grant MRI's Motion for Summary Judgment in part as it pertains to the statements MRI made to the IT vendor.

### O. Counterclaim IV: Tortious Interference with Contract

The elements of tortious interference with contract are (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) intentional procurement of its breach, (4) without justification, and (5) damages.  *Kallok*, 573 N.W.2d at 362. Defendants point to two contracts with which MRI allegedly interfered: (1) a contract executed by Wendy wherein the parties were one of the Minnesota Businesses and Altrua and (2) a contract with an IT vendor.  MRI states that it had no way of knowing that A.W. had contracts with either Altrua or the IT vendor.  However, the record evidence shows

that MRI was aware that A.W. was working with those entities and actively attempted to disrupt those relationships.  (Connolly Decl. in Opp., Exs. 23–27, 38.)  Whether MRI's interference was justified is a factual matter to be determined by a jury.

As to the final element, damages, the Court has sanctioned the Defendants by prohibiting them from entering any documentary evidence of damages, and they may only prove damages through witness testimony at trial.  (Order Adopting R&R at 12.) Because the Defendants can present evidence at trial through witnesses that may be able to satisfy the damages element of tortious interference and because MRI fails to show that the other elements have not been met, the Court will deny MRI's Motion for Summary Judgment on the Defendants' Tortious Interference with Contract Claim.

### P. Counterclaim VII: Fraudulent Inducement

MRI moves for summary judgment on the Defendants' Fraudulent Inducement claim.  Defendants allege that MRI fraudulently induced Allan Brown to sign the SPA with the false promise of selling the Minnesota Businesses to Wendy.

To establish that MRI falsely induced Allan Brown to sign the SPA, Defendants must prove that MRI made a false representation of a past or existing material fact susceptible of knowledge, with knowledge of the falsity, with intent to induce action, causing reliance and damages.  *Davis v. Re-Trac Mfg. Corp.*, 149 N.W.2d 37, 38–39 (Minn. 1967). Defendants assert that Allan Brown would not have entered into the SPA but for MRI's guarantee that it would sell the Minnesota Businesses to Wendy Brown.  MRI raises the same arguments it did in reference to the breach of contract claim: statute of frauds and

the SPA's Integration Clause.   However, Defendants do not argue that MRI was contractually bound to sell the Minnesota Businesses to Wendy Brown.   Rather they contend that MRI intentionally led Allan Brown to believe that if he entered into the SPA, MRI would sell Wendy the Minnesota Businesses.   Because the Court must interpret all ambiguity in favor of the non-moving party, these facts are sufficient to deny the motion. Moreover, there is sufficient evidence for a jury to find that Allan Brown entered into the SPA because of MRI's assurances that it would sell the Minnesota Businesses. Additionally, the defendants can prove they suffered damages because Allan Brown would not have lost his ownership stake in the Zwirns' business were it not for the misrepresentation.   Therefore, the Court will deny MRI's Motion for Summary Judgment on the Defendants' claim for Fraudulent inducement.

### Q. Counterclaim VIII: Negligent Misrepresentation

The elements of negligent misrepresentation are: (1) the defendant supplied false information to another person to guide that person's own business transactions; (2) the defendant failed to use reasonable care in obtaining or communicating that information; (3) the plaintiff relied on the information; (4) the plaintiff was justified in relying on that information; and (5) the plaintiff was financially harmed as a result.   *Hardin Cnty. Sav. Bank v. Hous. & Redevelopment Auth. of City of Brainerd*, 821 N.W.2d 184, 192 (Minn. 2012).

Defendants use the same argument to support its negligent misrepresentation claim as they did to support their fraudulent inducement claim.   Here, however, the issue

-33-

is not simply making a false statement, but supplying false information.  Defendants fail to present evidence of any false information presented to the Defendants.  Therefore, the Court will grant MRI's Motion for Summary Judgment on the Defendants' Negligent Misrepresentation claim.

### R. Counter Claim X: Unjust Enrichment

Lastly, MRI moves for Summary Judgment on the Defendants' Unjust Enrichment claim.  "So long as an adequate legal remedy exists, equitable remedies like unjust enrichment are not available."  *Loftness Specialized Farm Equip., Inc.*, 742 F.3d at 854 (citing *ServiceMaster of St. Cloud*, 544 N.W.2d at 305).  To state a claim for unjust enrichment, "the plaintiff must plead more than that one party benefit[ed] from the efforts or obligations of others, but instead must allege that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."  *Schaaf*, 517 F.3d at 554 (citing *First Nat'l Bank of St. Paul*, 311 N.W.2d at 504.

Defendants' argument in support of this claim is that MRI, through fraudulent misrepresentations, improperly retained the Minnesota Businesses instead of turning them over to Wendy.  However, "unjust enrichment does not occur when a defendant is enriched by what he is entitled to under a contract or otherwise."  *Id.*  The "enrichment" the Defendants allege came to MRI by contract, specifically the SPA.  Any obligation MRI had to turn the Minnesota Businesses over to Wendy Brown would have been governed

by the separate oral contract with Wendy.[7]   Thus, MRI was only allegedly enriched through its contract.  Legal remedies are available.  Therefore, the Court will grant MRI's Motion for Summary Judgment on the Defendants' Unjust Enrichment Claim.

## CONCLUSION

In sum, the Court will grant in part MRI's Motion for Summary Judgment as to Allan Brown's breach of contract, Defendants' claims for tortious interference with prospective business, defamation as it pertains to statements MRI made to its IT vendor, negligent misrepresentation, and unjust enrichment.  The Court will also grant in part Defendants' Motion for Summary Judgment on MRI's claims for fraud as it pertains to Allan Brown's acceptance of the alleged broker's fee, malicious injury, business defamation, violation of the DTPA, unjust enrichment, breach of the duty of loyalty, and breach of contract as it pertains to Batinich's alleged breach of contract.

The Court will deny in part MRI's Motion for Summary Judgment as to its claims for conversion, fraud, civil theft and conspiracy, and Defendants counterclaims for breach of contract, tortious interference with contract, and fraudulent inducement.

---

[7] If the Defendants were to argue that MRI was bound to sell the Minnesota Businesses to Wendy Brown through promises made in the course of negotiating the SPA, the integration clause of the SPA would have nullified those promises and the claim would still fail.  Moreover, if, as the Defendants allege, MRI breached a separate contract with Wendy Brown the proper remedy there would be obtained through the Breach of Contract Claim.

The Court will also deny in part Defendants' Motion for Summary Judgment as to MRI's claims for conversion, fraud it pertains to Wendy Brown's assertions of ownership of the Minnesota Businesses, tortious interference, misappropriation of trade secrets, and civil theft and conspiracy.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that;

1. Plaintiff's Motion for Summary Judgment [Docket No. 589] is **GRANTED in part and DENIED in part**, as follows:

    a. **GRANTED** as to Count VIII as it pertains to Allan Brown's Breach of Contract of Plaintiff's Second Amended Complaint, and Counts II, III as it pertains to statements Plaintiff made to its IT vendor, VIII and X of Defendants' Counterclaims; and

    b. **DENIED** with respect to all other claims.

2. Defendants' Motion for Summary Judgment [Docket No. 605] is **GRANTED in part and DENIED in part**, as follows:

    a. **GRANTED** as to Count II as it pertains to Allan Brown's acceptance of the alleged broker's fee, Count VIII as it pertains to Batinich's alleged breach of contract, and Counts III, IV, V, VII, and IX of Plaintiff's Second Amended Complaint; and

    b.  **DENIED** with respect to all other claims.


DATED:  September 30, 2022
at Minneapolis, Minnesota.

                                          JOHN R. TUNHEIM
                               United States District Judge